1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JESSE DAVID ALVAREZ,                  No. 1:17-cv-00546-DAD-JLT (HC)

12                   Petitioner,            **FINDINGS AND RECOMMENDATION
                                            TO DENY PETITION FOR WRIT OF**
13          v.                              **HABEAS CORPUS**

14    RAYMOND MADDEN, Warden,               **[TWENTY-ONE DAY OBJECTION
                                            DEADLINE]**
15                   Respondent.

16

17          Petitioner is currently serving life sentences in state prison for his conviction of two

18    counts of attempted murder and one count of assault with a firearm. He has filed the instant

19    habeas action challenging the conviction and sentence. As discussed below, the Court finds the

20    claims to be without merit and recommends the petition be **DENIED.**

21    **I.      PROCEDURAL HISTORY**

22          On December 28, 2011, Petitioner was found guilty in the Fresno County Superior Court

23    of two counts of attempted premeditated murder (Cal. Penal Code §§ 665/187(a)(1)), and one

24    count of assault with a firearm (Cal. Penal Code § 245). (Doc. 1 at 2.[1]) The jury found firearm

25    enhancements to be true. (Doc. 1 at 2.) For the first count, Petitioner was sentenced to life in

26    prison with possibility of parole plus twenty-five-years-to-life for the firearm enhancement.

27    _____

28    [1] Page references are to ECF pagination.

1   People v. Alvarez, 2016 WL 192164, at *1 (Cal.Ct.App. 2016).  He was sentenced to a

2   consecutive term of life in prison with the possibility of parole for the second count of attempted

3   murder.  Id.

4         Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

5   DCA").  The Fifth DCA affirmed the judgment on January 13, 2016.  Id.  Petitioner filed a

6   petition for review in the California Supreme Court, and the petition was summarily denied on

7   April 13, 2016.  Id.

8         On April 11, 2017, Petitioner filed the instant petition for writ of habeas corpus in this

9   Court.  (Doc. 1.)  Respondent filed an answer on July 20, 2017.  (Doc. 20.)  Petitioner filed a

10  traverse on December 29, 2017.  (Doc. 35.)

11  **II.     FACTUAL BACKGROUND**

12        The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[2]:

13  **A.  The first jury trial.**

14  Appellant's first trial began in October 2005. The court dismissed two counts for
    insufficient evidence that pertained to a third victim, Volodia's daughter and
15  Anna's younger sister, Diana A. Diana did not testify. The court declared a mistrial
    when the jury announced it could not reach verdicts on the remaining three counts
16  involving Anna and Volodia. Seven jurors were for guilty and five were for
    acquittal.
17
    **B.  The second jury trial.**
18
    The second trial commenced in June 2006. The jury found appellant guilty of
19  attempted murder with premeditation of both Anna and Volodia, and assault with a
    firearm of Anna. However, the court granted appellant's motion for new trial based
20  on juror misconduct, which the People appealed. On June 15, 2009, this court
    affirmed the new trial order in a nonpublished opinion. (*People v. Alvarez* (June
21  15, 2009, F054480).) The matter was remanded for a new trial.

22  **C.  The third jury trial.**

23  In January 2010, a third amended information was filed alleging attempted
    premeditated murder of both Anna and Volodia (§§ 664/187, subd. (a); counts 1 &
24  3), and assault with a firearm of Anna (§ 245, subd. (a)(2); count 2). Firearm
    enhancements were also alleged (§§ 12022.53, subds.(c) & (d), 12022.5, subd.
25  (a)(1)). Prior to trial, the prosecution alerted the court that Anna was unavailable as
    a witness. Anna's treating physician testified that Anna was pregnant with
26

27  [2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).
    Therefore, the Court will rely on the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir.
28  2009).

complications and on bed rest. Her physician opined that Anna's testimony at trial could cause serious trauma to both Anna and her unborn baby. The trial court ruled that Anna was legally unavailable to testify and her testimony from the two previous trials could be presented to the jury.

The third trial began in January 2010. Anna did not testify. The court declared a mistrial when the jury announced it was deadlocked "eight to four" on all three counts.

Appellant's fourth jury trial commenced in July 2011.

## II. Trial Facts From the Fourth Trial.

### A. Prosecution evidence.

#### 1. The shooting.

On September 23, 2004, Anna was in the home she shared with her husband, her father Volodia, her mother, and her sister Diana. Her husband, Gary, was not home but the others were present. Volodia was on house arrest and facing pending federal criminal charges. Anna responded to a knocking on her front security door. A Hispanic male said he was "from the agency" and had a delivery for Volodia. The male was holding envelopes so Anna believed it was a delivery for her father in connection to the federal case. She opened the door and looked at the male, keeping eye contact with him. She noticed that the male had green eyes, dimples that were more pronounced when he spoke, a very light mustache, and a clean shaven bald head. Anna could not remember at trial if the male had "a pimple or two" or an acne scar, but he had "pronounced cheekbones or something about his face." She saw the male's teeth but did not notice anything unusual about them.

Anna said she would be happy to deliver them, but the male insisted on personal delivery. He became aggressive and pushy. She asked to see identification and she took the envelopes from him. The male lifted his shirt and she saw he had a gun tucked into his trousers, which he pulled out. The male shot her in the upper left chest. Anna fled and she was shot twice more through her hand and an ear. She called out for her father.

Diana was in a bedroom when she heard a noise like a glass dropped and broke. [FN2] She came out and saw a male with a gun and he fired multiple times at her. She ran into a bedroom where her mother was staying. The male followed and tried to enter that bedroom while Diana and her mother tried to hold the bedroom door shut.

> [FN2] Diana testified in the third and fourth trials. Both trials occurred after the counts were dismissed that involved her as a victim.

Volodia had been in the backyard when he heard screaming. He ran inside and saw a male pushing on a bedroom door. The male held a gun with an attached silencer in his left hand. Volodia grabbed the male from behind and they struggled. Volodia dragged the male away from the bedroom door and down the hallway. The male broke free and fled out the front door.

Anna's neighbor, Melvin Jamison, heard a sound like firecrackers and he saw a male with a shaved head running from Anna's house. The male jumped into a parked four-door vehicle. Jamison saw three other baldheaded individuals in the

vehicle, which drove away. Jamison estimated that the males were between 20 and 25 years old. At trial, Jamison testified that the vehicle seemed to be a light color. However, on cross-examination he admitted he said the vehicle was either light brown or tan when speaking with responding officers on the day of the crime.

Both Diana and Volodia called 911. A responding officer found Anna lying on the floor in the entryway. Although she was in pain and having trouble breathing, she described her assailant as a Hispanic male in his mid to late 20's, and she described his clothing. The officer testified that Anna was conscious, she did not appear confused, but she was in an obvious state of fear. Later that night in the hospital, Anna informed another officer that her assailant was in his late 20's with a shaved head and brown colored eyes. Her attacker had acne scars all over his face and she did not mention dimples. The second officer described Anna as very emotional, but conscious, alert and responsive when she gave her statements. Anna, however, told the jury she could not remember telling the second officer that her assailant had acne scars, and she denied describing brown eyes.

Law enforcement located spent bullet casings and deformed bullets in the house, which established that a .380–caliber handgun had been used. Four envelopes were also discovered on the floor in the entryway. A bullet had penetrated all of the envelopes, making it possible to determine how they were once stacked. Fingerprints from appellant's left hand and his left palm print were discovered on one of the interior envelopes. The positioning of appellant's prints indicated he did not leave them simultaneously on that envelope, and it was impossible to determine when they were left.

After appellant's fingerprints were discovered, law enforcement prepared a six-pack photographic lineup. Anna picked out appellant as her assailant and told the detective that she was sure. The detective testified that Anna took anywhere from 45 seconds to a "couple minutes" to select appellant's photograph. At trial, Anna testified that appellant's photo immediately jumped out at her, but she thought she should look at all of the pictures to be fair. She looked at the photo next to appellant's picture because that other person appeared to have light colored eyes in the black and white photograph. After looking at other photos, Anna said she knew appellant's photo was correct, as she initially thought. However, Anna later told a district attorney investigator that she had struggled between two people in making her selection, but she told the jury she was very certain she selected the correct photo. A few weeks after the photo lineup, she saw a news report that showed appellant's photograph. Anna felt validated that she had picked the right person.

In court, Anna identified appellant as the person she selected from the lineup and the male who shot her. She confirmed she had testified previously in court and she had been very certain of her past courtroom identification of appellant. Jamison testified he was unable to identify the person who fled from Anna's house. Neither Diana nor Volodia saw the male's face and neither could identify the assailant.

## 2.  The car from Riverside, California.

Approximately 30 hours after the shooting, a security guard noticed a dirty vehicle with a broken window parked in an apartment complex in the vicinity of Anna's house. The security officer had not seen the vehicle the night before. He contacted law enforcement after he saw a handgun inside the car. Inside the vehicle, police recovered a cellphone and a .25–caliber handgun with an attached homemade silencer. No identifiable prints were found in the vehicle, on the gun, or on the cellphone.

4

The vehicle was a light blue 1984 Honda that belonged to Guillermo Canchola, who had resided in Riverside, California. Canchola died approximately five years before the fourth trial, and his past trial testimony was read into the record. In 2004, Canchola and appellant were neighbors in Riverside. Canchola stored the Honda on a two-acre lot approximately two miles from his house. He left the keys to the Honda under the floor mat. Canchola knew appellant and appellant had visited the lot where the Honda was stored. Canchola, however, had never seen appellant drive the blue Honda, and Canchola did not know the Honda had been taken from the lot until deputies arrived to question him after the Honda was discovered in Fresno.

At trial, Jamison identified a photograph of Canchola's blue Honda as being similar to the one he saw on the evening of the shooting.

**B. Defense evidence**.

Appellant's estranged wife, Nadja Assef, testified that appellant had had a chipped tooth since he first met him in 1987. He had never had acne scars or acne blemishes. She described his eye coloring as greenish and hazel.

Assef had lived with appellant in Riverside. In July 2004, Assef moved to Arizona with their children. Appellant helped with the move and then returned to Riverside to sell the home there. On September 9, 2004, Assef and their daughters returned to Riverside to attend a quinceañera. As they were driving to California, they learned that appellant had been in a motorcycle accident that day, approximately two weeks before Anna's shooting. Assef and the daughters visited appellant in the hospital. Appellant had bandages on his left side and he was in pain.

Appellant was able to attend the party on September 11, 2004, but he needed assistance when dressing and moving. He left early because he was in pain. Both Assef and appellant's daughter testified that appellant returned to Arizona the day after the quinceañera. According to Assef, appellant was unable to care for himself normally due to his injuries. Assef told the jury that appellant stayed with them in Arizona through approximately the first week of October before he returned to California. According to appellant's daughter, appellant remained in Arizona for two or three weeks. Assef said appellant was still dealing with an infection in his knee, and he still wore bandages on his knee and elbow, when he returned to California. Assef described appellant as not fully recovered when he returned.

Vincenzo Tarantino was Assef's neighbor in Arizona. He moved into that home on September 15, 2004. Approximately one to three weeks later he saw a person with a "burned arm" at Assef's house. He recalled it was a Thursday because he was taking out the trashcans. In court, Tarantino identified appellant as the person he saw at Assef's home and he was "pretty sure" of his identification.

Dr. Scott Fraser testified as an eyewitness identification expert. Based on hypotheticals that matched the facts of the case, Fraser opined it was almost a 100 percent certainty Anna's assailant had acne, a pockmark, or some type of ablation on his face. The fact Anna no longer reported acne was likely due to post-observational influences. Fraser opined that Anna's initial description of brown eyes, which she later changed to green eyes, was also the result of some post-observational influence that altered her memory. He opined that a distinctive cue, like appellant's chipped front tooth, should have been noticed with a high degree of accuracy assuming the tooth was easily seen. Fraser opined that Anna's accuracy would have been high during her initial encounter with her assailant before the gun

5

was produced. Finally, he opined that it was a less than five percent chance she selected the correct photograph in the lineup because she took longer than 12 seconds to make her selection and she struggled between two photos.

Tigran Pogosyan was a resident at the apartment complex where Canchola's blue Honda was discovered after the shooting. In court, Pogosyan identified a picture of Canchola's Honda as a vehicle he had parked behind for up to two weeks without noticing anything unusual about it.

## C. Rebuttal evidence.

Dr. Venu Gopal, a forensic pathologist, examined appellant's hospital records following his motorcycle accident. Gopal found no evidence that appellant suffered broken bones. Appellant had extensive road rash to his left upper extremity, around his knees, on the left top of his body, and he had road rash and an abrasion on his right hand. Appellant had an injury to his left elbow that required suturing. Gopal opined that appellant's injuries would typically take 10 days to two weeks to fully heal depending on the infection process and other factors. Appellant spent one night in the hospital, and his left arm was wrapped in a splint when he was discharged. Appellant's medical doctors did not place any limitations on him.

Three neighbors and another witness placed appellant in Riverside after the quinceañera. Jessica Franks stayed with appellant in his Riverside home, assisting him after his motorcycle accident for two or three weeks. She said appellant did not leave the house during those weeks except for maybe one day, but he was in considerable pain and had difficulty moving around, which lasted less than two weeks. On cross-examination, however, Franks admitted she was bad with dates and she struggled with drug abuse in 2004, which impacted her ability to remember. Further, James Olson, the district attorney investigator assigned to the case, testified that he spoke with Franks in 2005, and she indicated she lived in appellant's residence three weeks prior to his arrest. She then changed her statement and told Olson she started living with appellant two days prior to his motorcycle accident. In court, Franks could not recall telling Olson that she stayed in appellant's home from October 10 to November 7, 2004.

Ernesto and Sara Arzola, a married couple, previously lived near appellant in Riverside. The Arzolas attended the same quinceañera and saw appellant there with bandages. At trial, Sara could not remember if appellant stayed at the Riverside house after the quinceañera. However, according to Olson, Sara gave a statement in January 2010 saying appellant remained in the Riverside home after the quinceañera while his wife and children went back to Arizona. She informed Olson that she remembered seeing appellant riding his motorcycle with his arm still wrapped or bandaged after his wife left. At trial, Sara agreed that her statements to Olson were made when events were fresher in her mind and she was as honest then as she could recall. She testified she recalled seeing a young lady staying at appellant's Riverside home for two or three months before the quinceañera. Sara could not recall if the young lady stayed after the quinceañera.

Ernesto saw Assef and her children leave after the quinceañera and he did not see appellant leave with them. Ernesto saw appellant in the Riverside house during the week following the quinceañera. Ernesto saw appellant "just about every day." Ernesto believed appellant remained in Riverside until late October or November. Ernesto, however, previously made a statement to Olson indicating he only saw appellant for about a week after the quinceañera. Ernesto also told Olson that

appellant moved out of his house a few weeks before Assef moved to Arizona. <u>Alvarez</u>, 2016 WL 192164, at *1-5.

## III.    DISCUSSION

### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  <u>Williams v. Taylor</u>, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### B.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003); <u>Williams</u>, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."  <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) (citing <u>Williams</u>, 529 U.S. at 405-

7

406).

In <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" <u>Cullen v. Pinholster</u>, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." <u>Harrington</u>, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. <u>Davis v. Woodford</u>, 384 F.3d 628, 637 (9th Cir. 2003) (citing <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." <u>Wiggins v. Smith</u>, 539 U.S. 510, 520 (2003); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." <u>Jeffries</u>, 114 F.3d at 1500; <u>see</u> <u>Taylor v. Maddox</u>, 366 F.3d 992, 999-1001 (9th Cir. 2004), <em>cert.denied</em>, <u>Maddox v. Taylor</u>, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 979, 803 (1991); <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993); <u>see also</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 119-120 (2007) (holding that the <u>Brecht</u> standard applies whether or not the state court recognized the error and

8

1    reviewed it for harmlessness).

2        C.    Review of Claims

3        The instant petition presents the following grounds for relief: 1) The trial court abused its

4    discretion in declining to dismiss the case under Cal. Penal Code § 1385; and 2) Petitioner's

5    fourth trial was conducted in such a way as to violate his due process right to a fair trial and

6    protection from double jeopardy; alternatively, trial counsel was constitutionally ineffective in

7    failing to litigate this issue and its elements.

8        1.    Trial Court Discretion under Cal. Penal Code § 1385

9        Petitioner first claims the trial court abused its discretion in declining to dismiss

10   Petitioner's case pursuant to Cal. Penal Code § 1385 prior to the fourth trial in light of the seven-

11   year prosecution and three mistrials.  The claim was raised and rejected on direct appeal.  The

12   Fifth DCA issued the last reasoned decision denying the claim.  In reaching this conclusion the

13   state court determined that the trial court properly exercised its discretion under § 1385.

14       Respondent correctly argues that Petitioner fails to present a federal claim, since Petitioner

15   is challenging the application of state law.  It is well-settled that federal habeas relief is not

16   available to state prisoners challenging state law.  Estelle v. McGuire, 502 U.S. 62, 67 (1991)

17   ("We have stated many times that federal habeas corpus relief does not lie for errors of state law);

18   Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1997) ("alleged errors in the application of state

19   law are not cognizable in federal habeas corpus" proceedings).  Petitioner's challenge to the state

20   court's interpretation and application of Cal. Penal Code § 1385 does not give rise to a federal

21   question cognizable on federal habeas review.  Id.; Bradshaw v. Richey, 546 U.S. 74, 76 (2005)

22   ("We have repeatedly held that a state court's interpretation of state law, including one announced

23   on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus").

24   Thus, the claim is not cognizable on federal habeas and should be rejected.

25       2.    Double Jeopardy and Due Process

26       In his second claim for relief, Petitioner alleges that the fourth trial was conducted in such

27   a way as to violate his due process rights and his protection from double jeopardy.  He argues that

28   in the context of the entire seven-year litigation, the fourth trial became fundamentally unfair.

9

Petitioner sets forth numerous allegations of unfairness and prejudice, which were all rejected by

the state court on direct review.  This Court will address each allegation in turn.

a.  Procedural Default

First, the Court notes that as to several of the claimed violations, the state court

determined that Petitioner had forfeited those claims by failing to object at trial.  In the last

reasoned decision, the Fifth DCA stated as follows:

> Appellant asserts that each successive trial became more fundamentally unfair. He contends that over time the prosecution was able to make the case against him seem stronger than it was. Although he concedes that the number of trials did not violate due process, he contends it is how the prosecutor presented the fourth trial that violated his constitutional rights. He raises serious allegations of intentional prosecutorial misconduct and maintains he suffered a violation of due process and/or protection from double jeopardy.

> **A.  Appellant has forfeited specific claims of error in the fourth trial.**

> Appellant asserts four broad alternative theories of error and remedy: the due process right to a fundamentally fair trial; constitutional protections from double jeopardy; the state provision for dismissal in the interests of justice; and the right to effective assistance of counsel. He acknowledges that he did not raise an "unfair trial issue" in the trial court, but raises numerous arguments to establish forfeiture or waiver did not occur so that these claims can be addressed on appeal. In the alternative, he contends his defense counsel was constitutionally ineffective in failing to litigate the "unfair trial" issue.

> Respondent argues appellant's contentions should be narrowly viewed as alleged prosecutorial misconduct which was forfeited on appeal for failure to object. Appellant contends respondent's approach mischaracterizes the issues he has raised because many of his "unfair trial" arguments did not involve specific prosecutorial action but raised broader concerns regarding the "metamorphosis" of the evidence from the first trial to the last.

> In both criminal and civil cases, the United States Supreme Court will not review a federal claim unless the record establishes that the petitioner presented the state court with the nature and substance of the federal claim at the time and in the manner required by that state's law. (*Webb v. Webb* (1981) 451 U.S. 493, 501.) Likewise, the California Supreme Court generally finds forfeiture, and will not review a claim of federal constitutional error, in the absence of a specific and timely objection made in the trial court. (See *People v. Virgil* (2011) 51 Cal.4th 1210, 1260 [defendant's failure to object to a jury instruction or the prosecutor's closing argument forfeited the claim on appeal]; *People v. Romero* (2008) 44 Cal.4th 386, 411 [defendant forfeited on appeal any objection to violations to rules of court or to claims of error relating to interpreters following failure to object]; *People v. Monterroso* (2004) 34 Cal.4th 743, 759 [defendant forfeited claim on appeal after failing to object to the trial court's comments during death-qualification voir dire]; *People v. Burgener* (2003) 29 Cal.4th 833, 869 [defendant waived his constitutional claims on appeal after failing to object that introduction of evidence violated his federal rights to due process and confrontation]; *People v. Hill* (1992) 3 Cal.4th 959, 1000 [a defendant's failure to object and request an

admonition for alleged prosecutorial misconduct waives the issue if the objection and admonition would have cured the misconduct], overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

The forfeiture rule prevents gamesmanship by the defense and it allows errors to be corrected by the trial court. (*People v. Romero, supra*, 44 Cal.4th at p. 411.) Here, as we analyze each of appellant's claims, we will note as appropriate those specific issues which appellant has forfeited on appeal following a failure to object in the trial court. Regarding those instances, we will also examine whether appellant can establish ineffective assistance of counsel.

Alvarez, 2016 WL 192164, at *14-15.

A federal court will not review a claim of federal constitutional error raised by a state habeas petitioner if the state court determination of the same issue "rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991). This rule also applies when the state court's determination is based on the petitioner's failure to comply with procedural requirements, so long as the procedural rule is an adequate and independent basis for the denial of relief. Id. at 730. For the bar to be "adequate," it must be "clear, consistently applied, and well-established at the time of the [ ] purported default." Fields v. Calderon, 125 F.3d 757, 762 (9th Cir. 1997). For the bar to be "independent," it must not be "interwoven with the federal law." Michigan v. Long, 463 U.S. 1032, 1040-41 (1983). If an issue is procedurally defaulted, a federal court may not consider it unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 749-50.

In Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002), the Ninth Circuit held that California's contemporaneous objection doctrine is clear, well-established, and has been consistently applied when a party has failed to make any objection to the admission of evidence. In Vansickel v. White, 166 F.3d 953 (9th Cir. 1999), the Ninth Circuit held that the contemporaneous objection bar is an adequate and independent state procedural rule. As will be noted below, Petitioner did not object at trial to several of the alleged instances of unfairness. Thus, those allegations are procedurally defaulted and should be dismissed. In any case, as discussed below, the claims are without merit.

11

b.  <u>Double Jeopardy</u>

In rejecting Petitioner's Double Jeopardy claim, the Fifth DCA stated as follows:

Appellant contends the prohibition against double jeopardy required dismissal of his pending charges before the fourth trial. He maintains that the court's refusal to dismiss exacerbated the burdens he faced, destroying the constitutional protections to which he was entitled. He further argues the prosecutor used "new strategies" in the fourth trial and took "unfair advantage" of past mistakes. He claims the prosecutor presented the fourth trial with Anna's live "newly-strengthened testimony" which the prosecutor used "to sway the fourth jury." He relies principally on *Arizona v. Washington* (1978) 434 U.S. 497 (*Washington*) and *Carsey v. United States* (D.C.Cir.1967) 392 F.2d 810 (*Carsey*) for the principle that double jeopardy shields against grossly unfair multiple trials that increase the risk of conviction. He argues the federal and state Constitutions and "justice" should have prevented the government from taking a "manipulative approach" to his criminal prosecution. These arguments and authorities are unpersuasive.

The double jeopardy clause protects against three concerns: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) against multiple punishments for the same offense. (*Ohio v. Johnson* (1984) 467 U.S. 493, 498.) The prohibition of retrial following acquittal or conviction "ensures that the State does not make repeated attempts to convict an individual, thereby exposing him to continued embarrassment, anxiety, and expense, while increasing the risk of an erroneous conviction or an impermissibly enhanced sentence." (*Id*. at pp. 498–499.) The federal Constitution establishes the minimum standards of double jeopardy protection for criminal defendants but the California Constitution, Article I, section 15, may provide for higher levels of protection. (*People v. Batts* (2003) 30 Cal.4th 660, 686.)

Double jeopardy protection does not prevent retrial for an offense when the prior conviction for that same offense has been set aside on appeal. (*Green v. United States* (1957) 355 U.S. 184, 189.) It also does not bar retrial following a mistrial that occurred due to a hung jury. (*People v. Batts, supra*, 30 Cal.4th at p. 679.) A defendant's request for a mistrial constitutes a waiver of any double jeopardy claim and there is no double jeopardy bar to retrial. (*Id*. at pp. 679–680.) The federal Constitution bars retrial if, and only if, the prosecution intended the mistrial to occur. (*People v. Batts, supra*, at p. 682.)

In *Washington, supra*, 434 U.S. 497, the trial court granted the prosecutor's motion for a mistrial based on improper and prejudicial comments during defense counsel's opening statement. (*Id*. at p. 498.) The *Washington* court examined whether sufficient "'necessity'" existed for the mistrial ruling to avoid double jeopardy. (*Ibid*.) The high court noted that the double jeopardy clause bars a retrial where the judge or prosecutor engaged in bad-faith conduct, the defendant is threatened by harassment of successive prosecutions, or the government takes actions to obtain a mistrial to have a more favorable opportunity to convict the defendant. (*Id*. at p. 508.) *Washington* determined that the trial court did not abuse its discretion in granting the mistrial. (*Id*. at pp. 514–517.)

In explaining the principle of double jeopardy, *Washington* noted the general rule that a prosecutor is entitled to one, and only one, opportunity to try a criminal defendant. (*Washington, supra*, 434 U.S. at p. 505.) A second trial may be grossly unfair due to the increased financial and emotional burdens, the prolonged

stigmatization by an unresolved accusation of wrongdoing, and a second trial could enhance the risk an innocent person is convicted. Subtle changes in the State's testimony may occur over the course of successive prosecutions. (*Id*. at pp. 503–504 & fn. 14.) *Washington* cited with approval the concurring opinion of Judge Harold Leventhal from the United States Court of Appeals for the District of Columbia Circuit in *Carsey, supra*, 392 F.2d 810. (*Washington, supra*, at p. 504, fn. 14.)

In *Carsey, supra*, 392 F.2d 810, the defendant's first two trials ended in hung juries. The third trial ended when the prosecutor requested a mistrial over a defense objection. The defendant petitioned against a fourth trial and argued double jeopardy was implicated, but his petition was denied. He was convicted of murder in his fourth trial and he appealed. (*Id*. at p. 811.) *Carsey* found no manifest necessity had existed to declare a mistrial during the third trial. (*Id*. at p. 812.) *Carsey* reversed on double jeopardy grounds, finding that the prosecution should not benefit from the prejudice which it created. (*Ibid*.)

In a concurring opinion, Judge Leventhal reviewed the dangers the double jeopardy clause was intended to prohibit. The State with all of its resources and power should be prohibited from making repeated attempts to convict an individual for an alleged offense. Such repeated attempts subject the defendant to an ordeal of embarrassment, expense, a continuing state of anxiety and insecurity, as well as increasing the chance of an erroneous conviction. (*Carsey, supra*, 392 F.2d at p. 813.) Judge Leventhal noted the defendant on appeal had been confronted with such anxiety and ordeal. After initially retaining counsel, the defendant had proceeded in forma pauperis presumably due to a depletion of funds. The defendant had spent over nine months in jail and endured 18 days of trial spread out over three proceedings in more than a year. (*Ibid*.) Over the course of the trials, certain government witnesses had altered their testimony to provide more favorable evidence for the prosecution. (*Id*. at pp. 813–814.)

Appellant asks this court to adopt and expand Judge Leventhal's analysis. He suggests we explore "why double jeopardy is a good idea" and to determine how the unique facts of his case establish a violation of double jeopardy or, alternatively, a violation of either due process, the interests of justice, or the right to effective assistance of counsel. He asserts that the retrial process tilted his doubtful case towards conviction. These contentions are without merit.

Both *Washington* and *Carsey* dealt with a mistrial requested by the prosecution. (*Washington, supra*, 434 U.S. at p. 499; *Carsey, supra*, 392 F.2d at p. 811.) In *Washington*, the prosecutor made improper and prejudicial remarks during his opening statement to the jury. (*Washington, supra*, 434 U.S. at p. 510.) The trial court granted the prosecution's motion for a new trial but without expressly finding that there was "manifest necessity" for one. The Ninth Circuit Court of Appeals affirmed a writ of habeas corpus, determining the defendant could not be placed in further jeopardy because the trial judge had failed to find "manifest necessity" for a mistrial. (*Id*. at pp. 501–503.) The Supreme Court, however, determined that the Ninth Circuit attached undue significance to the form of the trial court's ruling, and it reversed. (*Washington, supra*, 434 U.S. at p. 503.) *Washington* found that the trial court acted responsibly and deliberately in affording both parties an opportunity to argue their positions. Because the state trial court exercised sound discretion, the Supreme Court held that its mistrial order was supported by a necessary degree of necessity and it could not be challenged collaterally in the federal courts. (*Id*. at pp. 515–517.)

In contrast, in *Carsey, supra*, 392 F.2d 810, the defendant was tried four times for murder, and he was convicted in the fourth trial. The first two trials ended because the juries could not agree. In the third trial, defense counsel referenced the two previous mistrials during closing argument. The following day, the prosecutor sought a mistrial, which was granted. (*Id*. at p. 811.) The *Carsey* court held that double jeopardy barred the fourth trial because no necessity existed to grant the third mistrial. (*Id*. at p. 812.) *Carsey* determined that defense counsel's comments were not substantially prejudicial to the prosecution's case. (*Ibid*.) *Carsey* reversed on double jeopardy grounds, finding that the prosecution should not benefit from prejudice which it created in seeking a mistrial. (*Ibid*.)

Here, this record does not establish, and appellant does not contend, that the prosecution intended or created the mistrials. Both *Washington* and *Carsey* are distinguishable from the present matter and neither case dictates reversal of appellant's convictions. Appellant's previous trials had ended following two mistrials and an order for a new trial, which was affirmed on appeal. Double jeopardy did not bar the fourth trial. Accordingly, we decline appellant's invitation to adopt and expand Judge Leventhal's analysis of that doctrine under the unique facts of this case.

Alvarez, 2016 WL 192164, at *15-17 (footnotes omitted).

The Double Jeopardy Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., Amdt. 5. "The Double Jeopardy Clause 'protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.'" Brown v. Ohio, 432 U.S. 161, 165 (1977) (quoting North Carolina v. Pearce, 395 U.S. 711, 717 (1969)).

Where a mistrial is declared, Double Jeopardy principles bar a second trial only if the conduct giving rise to the mistrial was prosecutorial or judicial misconduct that was intended to provoke the defendant into moving for a mistrial. Oregon v. Kennedy, 456 U.S. 667, 669 (1982). In addition, the Supreme Court has held that it is undisputed that "when a judge discharges a jury on the grounds that the jury cannot reach a verdict, the Double Jeopardy Clause does not bar a new trial for the defendant before a new jury." Renico v. Lett, 559 U.S. 766, 773 (2010) (citing United States v. Perez, 9 Wheat. 579, 579-80, 6 L.Ed. 165 (1824)).

In this case, two mistrials were declared when the juries were unable to reach a verdict, and one mistrial was declared upon Petitioner's request due to juror misconduct. Under the principles set forth above, Petitioner fails to establish a Double Jeopardy violation.

///

1   c. <u>Due Process</u>

2    In his next claim, Petitioner alleges his fourth trial was fundamentally unfair in violation

3 of his due process rights due to variances in the fourth trial as compared to the first three trials.

4 This claim was also raised and rejected by the Fifth DCA, as follows:

> Appellant contends due process required dismissal of his pending charges before the fourth trial. He further argues his fourth trial was fundamentally unfair in how it was prosecuted, especially in light of the previous trials. To establish a fundamentally unfair fourth trial, appellant contends the entire seven-year prosecution must be examined, and he relies on *In re Sakarias* (2005) 35 Cal.4th 140 (*Sakarias*) as precedent for this approach. With multiple citations to *Sakarias* in his opening brief, appellant appears to also rely on *Sakarias* as authority that his fourth trial was fundamentally unfair. This reliance is misplaced.

> In *Sakarias*, two criminal defendants were tried separately and each convicted of first degree murder for the death of the same victim. During their separate jury trials, the same prosecutor presented factual theories inconsistent with those presented at the codefendant's trial. The two trials established that both defendants participated in the fatal attack of the victim. The prosecutor falsely attributed to each defendant, in their separate trials, that the respective defendant was responsible for a series of three blows struck to the victim's head with a hatchet. (*Sakarias, supra*, 35 Cal.4th at pp. 144–145.) Our Supreme Court agreed that the prosecutor's intentional presentation of inconsistent and irreconcilable factual theories in the two separate trials violated due process because the prosecutor attributed to each defendant culpable acts that could have been committed by only one person. (*Id*. at p. 145.)

> Appellant argues the *Sakarias* court did not limit its review to the isolated record from one trial or the other. Instead, *Sakarias* conducted its review by comparing the two trials in order to determine whether due process was violated. (*Sakarias, supra*, 35 Cal.4th at pp. 147–149.) He urges that we take a similar approach here and review all four of his trial records.

> It is appropriate to review appellant's due process claims in the context of the seven-year prosecution because appellant contends the prosecutor committed misconduct in how he presented the fourth trial when compared with the prior trials. However, unlike in *Sakarias*, the prosecutor did not present inconsistent and irreconcilable factual theories in the separate trials. *Sakarias* is factually distinguishable from the present matter and does not dictate reversal.

> In a criminal trial, a denial of due process occurs when fundamental unfairness is present. (*Lisenba v. California* (1941) 314 U.S. 219, 236.) Fundamental unfairness rising to a due process violation can occur through a variety of ways, including coerced confessions, or actions by State actors amounting to fraud, collusion, trickery, or subordination of perjury. (*Id*. at pp. 236–237.) A miscarriage of justice can also occur through a series of trial errors which individually do not warrant reversal but cumulatively are prejudicial. (*People v. Hill* (1998) 17 Cal.4th 800, 844.) Prosecutorial misconduct can also create fundamental unfairness. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 (*Samayoa*).) Prosecutorial misconduct occurs when a prosecutor engages in a pattern of egregious conduct that infects the trial with a level of unfairness, or the prosecutor uses deceptive or reprehensible methods to persuade the trier of fact. (*People v. Maciel* (2013) 57 Cal.4th 482, 541

1     (*Maciel*); *Samayoa, supra*, 15 Cal.4th at p. 841.)

2     A prosecutor, however, is permitted to make variations in emphasis between trials
3     without violating due process. (*People v. Richardson* (2008) 43 Cal.4th 959, 1017
    (*Richardson*).) In *Richardson*, the defendant was convicted of murder while his
4     accomplice was tried separately. (*Id.* at pp. 970, 1015.) The defendant contended
    on appeal that the prosecutor violated his due process rights by presenting
5     factually and legally inconsistent theories at his trial and in the trial of his
    accomplice. (*Id.* at p. 1015.) The *Richardson* court rejected this argument, noting
6     the situation presented in *Sakarias, supra*, 35 Cal.4th 140 was not present.
    *Richardson* determined the prosecutor proceeded in both cases on the same theory
7     that the defendant was the killer and his accomplice only aided him. (*Richardson,*
    *supra*, 43 Cal.4th at p. 1017.) Because inconsistent theories were not used, and
8     because the prosecutor was entitled to make variations in emphasis between the
    two trials, no due process violation occurred.

9     Here, the prosecutor did not rely on inconsistent theories. Although the prosecutor
    made changes in emphasis, a due process violation is not present. Appellant,
10     however, argues Anna's identification of him as the shooter underwent a
    "metamorphosis" as her testimony regarding her assailant's identity evolved over
11     time to match appellant's appearance. He maintains she became a stronger and
    better witness with each trial. He points to numerous discrepancies between the
12     fourth trial and the earlier trials. He further asserts that the prosecutor attempted to
    mislead the jury by knowingly manipulating the evidence and making false
13     arguments in an effort to obtain a conviction. We analyze below each of
    appellant's concerns.

14

15 Alvarez, 2016 WL 192164, at *17-18.

16     The Supreme Court has held that "(a)s applied to a criminal trial, denial of due process is

17 the failure to observe that fundamental fairness essential to the very concept of justice. In order to

18 declare a denial of it we must find that the absence of that fairness fatally infected the trial; the

19 acts complained of must be of such quality as necessarily prevents a fair trial." Lisenba v.

20 California, 314 U.S. 219, 236 (1941).  Examples of such fundamental unfairness are convictions

21 obtained through coerced confessions, and confessions obtained by fraud, collusion, trickery, and

22 subornation of perjury. Id. at 236-37.   In this case, Petitioner points to several instances where

23 his trial was allegedly fundamentally unfair.  As set forth below, the appellate court addressed

24 each instance and found no unfairness.

25            i.      Defense Identification Expert

26     Petitioner contends the prosecutor committed misconduct with respect to the defense

27 identification expert.  The state court rejected the allegation as follows:

28

Appellant contends the prosecutor prejudicially misled the jury regarding the defense's identification expert. He alleges the prosecutor ignored or twisted the expert's testimony regarding the "rule of 10 to 12" and improperly branded the expert a liar.

**a. Background.**

During the fourth trial, Dr. Scott Fraser testified for the defense regarding eyewitness identification. Fraser explained that the "rule of 10 to 12" was a criteria to judge a witness's probability of correctly identifying a suspect in a lineup. With all criteria being equal, the likelihood of a correct identification is 85 percent or higher when a witness selects a suspect immediately. It is 40 to 60 percent likely an identification was correct when the witness looks at the array of options and considers them for approximately six seconds. If the witness takes 10 to 12 seconds or more, the likelihood is less than five percent. Fraser testified that the longer a witness looks at an array of options the more likely the task changes from selecting a match to selecting the closest match among the group presented. Fraser, however, noted that a witness who takes a considerably long time to select a suspect is not wrong, only that there is a higher probability a wrong choice was made.

Defense counsel presented Fraser with a hypothetical in which a witness spends a minute or more in her selection of a suspect, and the witness said she struggled between one photo and another. Fraser opined the likelihood of a correct selection under that scenario would be less than five percent.

During cross-examination, the prosecutor asked if it was true that a 90 percent accuracy rate occurs when witnesses take 10 to 12 seconds to make their selections, and a 50 percent accuracy rate occurs for those taking more time. Fraser said that was correct based on a study at Cornell University which had "rather optimal conditions" so that it had a "high rate" of correct selections. During Fraser's cross-examination, the prosecutor referred to an unspecified article and asked Fraser if he agreed with those statistics. Fraser said, "I'm sure you're reading it from the book, from the article, yes." Fraser qualified those statistics, explaining the 50 percent accuracy rate was "the hit rate" and, when the false positives were combined, a five percent accuracy rate was reached.

During closing arguments, the prosecutor stated that the issue of eyewitness identification "is a matter of common sense." He argued that some of what Fraser said was accurate: the lighting conditions, the distance between the witness and the suspect, and the length of time that passed between the people. However, the prosecutor said some of Fraser's testimony was not believable, and "the best lie" has a little bit of truth in it. The prosecutor argued that Fraser's "rule of 10 to 12" was incorrect. The prosecutor contended that witnesses have a 50 percent accuracy rate when identifying a suspect after 12 seconds and not a five percent accuracy rate as Fraser testified. The prosecutor contended Anna immediately recognized appellant's photograph even though she spent more time scrutinizing other photos, and he invited the jury to disregard Fraser's testimony, contending Fraser lied. The prosecutor referenced CALCRIM No. 226, and noted the jurors could disregard a witness's testimony if the witness deliberately lied about something significant in the case, or they could disregard portions of the witness's testimony. He asked the jurors to review Fraser's testimony through their life experiences and use common sense. He argued Fraser was paid by the defense and was used "to get people off."

### b. Analysis.

Appellant contends the prosecutor "crossed the line" three times regarding Fraser. First, he argues the prosecutor both mischaracterized the evidence and argued it in a way that materially misled the jury. Second, he asserts the prosecutor unfairly and improperly attacked Fraser as a liar. Finally, he maintains the prosecutor improperly relied upon information outside the record, contending no evidence supported the prosecutor's allegation that Fraser was a liar. We disagree.

Appellant failed to object to the prosecutor's argument in the trial court, resulting in a forfeiture of this claim on appeal. (*People v. Virgil, supra*, 51 Cal.4th at p. 1260; *People v. Hill, supra*, 3 Cal.4th at p. 1000.) This claim also fails on the merits.

A prosecutor commits prosecutorial misconduct when he or she misstates evidence during closing arguments. (*People v. Davis* (2005) 36 Cal.4th 510, 550 (*Davis*).) However, a prosecutor has wide-ranging latitude to discuss the case in closing argument. (*People v. Panah* (2005) 35 Cal.4th 395, 463.) A prosecutor is permitted to fully state his views regarding what the evidence establishes and to urge whatever conclusions he deems proper. (*Ibid.*) A prosecutor is entitled to question an expert's testimonial consistency and possible bias. (*People v. Sandoval* (1992) 4 Cal.4th 155, 180.) A prosecutor may refer to testimony as "'lies'" so long as the prosecutor argues inferences based on the evidence and not on the prosecutor's personal belief. (*Ibid.*) "Closing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence." (*Ibid.*)

Here, the prosecutor urged the jury to use its common sense and disregard Fraser's testimony, which was within the prosecutor's right. The prosecutor was also within his right to offer his views regarding what the evidence established and to urge a contrary conclusion to Fraser's opinion. Moreover, Fraser agreed that the prosecutor's cited percentages were correct but explained why differences existed. Evidence existed in this record from which the prosecutor could disagree with Fraser's opinion. The prosecutor did not materially mislead the jury, rely on facts not in the record, or commit misconduct.

Finally, appellant cannot establish ineffective assistance of counsel regarding his counsel's failure to object to this issue. To establish such a claim, appellant must first show that his counsel's performance was below an objective standard of reasonableness. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051–1052.) However, unless there can be no conceivable reason for counsel's acts or omissions, ineffective assistance of counsel will not be found if the record does not establish counsel's trial tactics or strategic reasons for the challenged decision. (*Ibid.*) Moreover, an attorney is not deemed incompetent when he or she fails to lodge meritless objections. (*People v. Lucero* (2000) 23 Cal.4th 692, 732.)

Here, appellant's claim has no merit so an objection by defense counsel would have been unavailing. (*People v. Lucero, supra*, 23 Cal.4th at p. 732.) Accordingly, appellant's claim of ineffective assistance fails. (*People v. Nguyen, supra*, 61 Cal.4th at pp. 1051–1052.)

<u>Alvarez</u>, 2016 WL 192164, at *19-20.

As Respondent notes, the state court determined that Petitioner had forfeited this claim by

failing to contemporaneously object at trial. Because California's contemporaneous objection

18

rule is clear, well-established, and has been consistently applied, and it is an adequate and independent state procedural rule, the claim is procedurally defaulted and must be dismissed.

In addition, the claim is without merit because Petitioner fails to demonstrate that the state court rejection was contrary to or an unreasonable application of Supreme Court authority. He faults the prosecutor for mischaracterizing the evidence and urging the jury to reject his testimony. However, in closing arguments, the prosecutor is allowed wide latitude to discuss evidence adduced at trial and to argue reasonable inferences from that evidence. United States v. Sayetsitty, 107 F.3d 1405, 1409 (9th Cir. 1997); United States v. Gorostiza, 468 F.2d 915, 916 (9th Cir. 1972). Additionally, improprieties in the prosecutor's arguments do not constitute reversible error "unless they are so gross as probably to prejudice the defendant, and the prejudice has not been neutralized by the trial judge." United States v. Parker, 549 F.2d 1217, 1222 (9th Cir. 1977). As reasonably determined by the state court, the prosecutor's remarks concerning the defense expert constituted fair argument based on the evidence. The state court reasonably determined that the prosecutor's arguments were not improper. Thus, the claim is without merit.

In addition, Petitioner's claim that defense counsel rendered ineffective assistance by failing to object to the prosecutor's argument is meritless. The prosecutor's remarks were not improper; therefore, defense counsel cannot be faulted for failing to object. Lowry v. Lewis, 21 Cal.3d 344, 346 (9th Cir. 1994).

ii. Changes in Witness's Testimony

Petitioner next alleges that his fourth trial was fundamentally unfair because the key eyewitness's testimony became stronger with each trial. This claim was also rejected by the state court as follows:

> Appellant argues that Anna, who was the most important witness for the prosecution, became stronger with each passing trial. He concedes that Anna reasonably could be expected to improve as a witness given multiple opportunities to testify, but he contends that did not make her testimony any more accurate or truthful, which the fourth jury would not know. He asserts the court allowed the prosecutor to rely on a new and improved Anna in the fourth trial while he was forced to use "devalued transcripts" for impeachment. He describes this as an unfair burden shift. He maintains that Anna took advantage of the trial court's decision to give the prosecutor yet another chance after the prosecution had three practice swings. He asserts Anna's goal was to become a stronger witness each time, and he argues she gave the jury a reason to believe her 2011 testimony was

19

more valuable than her 2005 version.

Respondent argues that defense counsel had opportunity to cross-examine Anna regarding any changes in her testimony, the reason for those changes, and whether her current testimony was more or less accurate than her previous testimony. Respondent contends appellant presents no authority that due process is violated when a witness becomes less emotional and more able to convey her testimony. Respondent maintains no burden shift occurred, which remained proof beyond a reasonable doubt.

The United States Supreme Court has described cross-examination as "the 'greatest legal engine ever invented for the discovery of truth [.]' " (*California v. Green* (1970) 399 U.S. 149, 158.) Our Supreme Court has noted the high degree of safeguards resulting from cross-examination and the use of a witness's prior inconsistent statements. (*People v. Zapien* (1993) 4 Cal.4th 929, 953.) The jury is able to learn firsthand why the witness changed his or her story, and which version of events is true and which is false. (*Ibid.*)

Here, defense counsel was free to cross-examine and impeach Anna on all aspects of her testimony, including the topic of her experience as a witness and the degree to which she became less emotional over time. It was for the jury to assess Anna's answers. Appellant was free to argue the jury should disregard Anna's testimony in the fourth trial given the lengthy passage of time and her progression as a stronger witness. This record, when examined in the context of the entire seven-year prosecution, does not establish a fundamentally unfair fourth trial.

Alvarez, 2016 WL 192164, at *20-21.

The state court also addressed Petitioner's claim that Anna's testimony went through a

metamorphosis which rendered the trial fundamentally unfair:

Appellant points to numerous inconsistencies in Anna's testimony occurring over the trials, contending her descriptions of her assailant moved exclusively towards guilt. He maintains that both Anna and the prosecutor "clouded the picture" over the four trials regarding Anna's interactions with police, and her testimony evolved over time regarding the photographic lineup. He asserts it was fundamentally unfair to face such evolving testimony in the numerous trials, and contends the prosecutor took advantage of Anna's changing testimony. Despite arguably describing the wrong person to two officers, and despite the defense expert's opinion that initial descriptions are more likely accurate, Anna became a "trained" eyewitness who gave the jury a reason to doubt the accuracy of her initial descriptions. Appellant maintains that this resulted in an unfair presentation of evidence that evolved not from investigation but through repeated opportunities for the prosecution to present its case. He relies on *United States v. Chapman* (9th Cir.2008) 524 F.3d 1073 as authority that dismissal is the proper remedy where retrial would give the government an unfair advantage. This reliance and his arguments are unpersuasive.

In *United States v. Chapman, supra*, 524 F.3d 1073, the prosecutor failed to disclose approximately 650 pages of documents to the defense, which came to light during the third week of trial. (*Id*. at pp. 1078–1079.) The trial court declared a mistrial. Following a hearing, the court granted a defense motion to dismiss the indictment, and the government appealed. (*Id*. at p. 1080.) The Ninth Circuit Court of Appeals determined the trial court did not abuse its discretion in declaring the

mistrial, and double jeopardy did not bar retrial. However, the Ninth Circuit found no abuse of discretion in the dismissal of the indictment. (*Id*. at pp. 1083–1084.) It noted that a trial court may dismiss an indictment when a defendant suffers substantial prejudice and no lesser remedial action is available. The Ninth Circuit affirmed the lower court's finding that another trial would only advantage the government, which conducted a poor prosecution with myriad weaknesses. A retrial would allow the prosecution opportunity to correct its mistakes, and its witnesses would be subsequently stronger. Accordingly, a dismissal was the only means of avoiding prejudice to the defense. (*Id*. at p. 1087.)

Here, unlike in *United States v. Chapman, supra*, 524 F.3d 1073, the prosecution did not engage in discovery violations resulting in a mistrial. Although the case against appellant was not overwhelming, the prosecution did not prejudice appellant's defense before seeking a retrial. *United States v. Chapman* is distinguishable and does not dictate reversal.

Appellant concedes he could and did impeach Anna's testimony with her prior inconsistent statements. He argues, however, that the fourth jury did not see the earlier version of Anna, but a less emotional and more accurate witness. He insists that dismissal is the proper remedy because the retrial gave the prosecution an unfair advantage.

However, it was the jury's exclusive role to judge this, and all other, disputed facts and determine Anna's credibility. (§ 1127; CALCRIM No. 200.) Appellant was not prevented from vigorous cross-examination, the greatest device to discover truth, to alert the fourth jury regarding inconsistencies in Anna's statements to law enforcement and her trial testimony. Our Supreme Court has noted the high degree of safeguards resulting from cross-examination and the use of a witness's prior inconsistent statements. (*People v. Zapien, supra*, 4 Cal.4th at p. 953.) The fourth jury was able to learn firsthand why Anna changed her statements, and which version of events was true. A due process violation does not appear on this record based on Anna's alleged metamorphosis as a witness.

*Alvarez*, 2016 WL 192164, at *24-25.

The state court reasonably determined that Petitioner's trial was not rendered fundamentally unfair. To the extent that Anna may have altered her version of events through each trial, Defendant could and did cross-examine her and bring these changes to the jury's attention. The Supreme Court has stated that "cross-examination [is] the 'greatest legal engine ever invented for the discovery of truth.'" California v. Green, 399 U.S. 149, 158 (1970) (quoting 5 Wigmore § 1367). Petitioner had the "'opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling h[er] to stand face to face with the jury in order that they may look at h[er], and judge by h[er] demeanor upon the stand and the manner in which [s]he gives h[er] testimony whether [s]he is worthy of belief.'" Id. at 157-58 (quoting Mattox v. United States, 156 U.S. 237, 242-243 (1895)). Thus, Petitioner fails to demonstrate a

21

1    violation of his due process rights.  The claim should be rejected.

2                    iii.    Anna as Expert Witness

3        In a related claim, Petitioner contends that the prosecutor committed misconduct by

4    highlighting Anna's training and experience as a bank teller, thereby making it appear that Anna

5    was an expert witness on identifications.  The state court rejected the claim as follows:

6        Appellant asserts the prosecutor committed misconduct in misleading the fourth
         jury regarding Anna's ability to make an identification based on her training or
7        experience as a bank teller. He argues the prosecutor used a jury instruction that
         was contrary to the evidence which had been developed in the prior trials.
8
         During the fourth trial, a modified version of CALCRIM No. 315 was read to the
9        jury, which asked the jury, in part, to consider whether a witness had "any specific
         training or experience which would enhance the ability to make an
10       identification[.]" This language does not appear in CALCRIM No. 315. A similar
         jury instruction regarding witness identification had been read to the three previous
11       juries without this added language.

12       Anna testified live three times. In the first trial, Anna was briefly asked about her
         type of work and educational background. She indicated she was in human
13       resources, had a bachelor's degree in business management and was pursuing a
         master's degree. Later in her direct examination, when asked why she grabbed the
14       envelopes from appellant's hand, Anna explained her bank teller training taught
         her to take any note from a robber. She said alarms had gone off in her head.
15
         During the second trial, the prosecutor asked Anna about her work and educational
16       background. Before turning to the facts of the crime, the prosecutor asked Anna if
         she received any training on how to interact with customers. Anna explained she
17       had been a teller in a bank, which required training on how to deal with customers
         and what to do if a robbery occurred. Anna said she was to look for specific
18       characteristics in people in order to identify them, and to hold evidence if possible,
         such as a robber's note. Anna stated this was something she had incorporated into
19       her daily life and habits. She tried to maintain eye contact with people and actively
         listen to them.
20
         During the fourth trial, the prosecutor again asked Anna questions regarding her
21       training and experience as a bank teller. Anna said she was taught basic
         expectations, such as eye contact and listening to expectations, and she had
22       incorporated maintaining eye contact in her daily life. The prosecutor asked if she
         had received training about "high-stress situations" like a robbery, and Anna
23       explained she was taught to be aware of her surroundings, facial characteristics,
         skin color, height, hair color and any accent the person had to identify the suspect
24       later. The prosecutor asked if Anna had received training involving facial
         characteristics, and she indicated she had participated in mock robberies and was
25       now a trainer of other employees. She was required to recall details such as a
         suspect's clothing and to hold on to a demand note if possible.
26
         The defense elicited testimony from identification experts in all of the trials except
27       the second. During cross-examination in the first trial, the defense identification
         expert, Dr. Robert Shomer, indicated only a small group of people, such as secret
28       service agents, can undergo training in order to be better at identifying people. He

                                        22

noted it required special training and involved people who spent many hours each day studying faces. Shomer agreed that a person could enhance their ability to recall a face, even under stressful conditions, through training. Shomer also agreed that if a person was focusing on a subject's face it would result in a more accurate identification, and the longer the person interacted with the subject, a more detailed description would occur.

In the third trial, a different defense identification expert testified, Dr. Scott Fraser. He agreed with the prosecutor that people with different training and aptitudes will be better at recalling events, but he noted no scientific study had ever established that a training procedure was associated with more accurate facial recognition. Fraser explained that facial recognition is "largely hard wired" into people, and someone who works often with people's faces, like a cosmetologist, would be no better at recognizing a stranger. Fraser disagreed that people could improve their ability to recognize faces through training. He did not know of any research showing the training programs tried by banks, retail outlets, or law enforcement improved facial recognition and, instead, he believed such programs usually decreased accuracy.

In the fourth trial, Fraser again testified as the defense identification expert. During the last trial, neither defense counsel nor the prosecutor asked Fraser about the effects of training on facial recognition. During closing arguments, the prosecutor emphasized that Anna had been absolutely clear that appellant was her shooter when she both testified in court and in her contact with law enforcement. The prosecutor stated that some of what Fraser said was common sense, and he reviewed the factors outlined in CALCRIM No. 315 regarding eyewitness identification, including the additional language regarding the effect of any specific training or experience which could enhance an identification.

Appellant contends the fourth jury did not learn about Fraser's earlier opinion that training does not improve facial recognition. He argues the prosecutor intentionally misled the jury by using the modified language in CALCRIM No. 315, asserting the prosecutor knew that instruction was directly undermined by evidence developed in the earlier trials. He maintains the prosecutor urged an improper inference, contending the prosecutor suggested that Fraser had endorsed the training point which Fraser had previously rejected. He maintains the jury could have reasonably misconstrued or misapplied the prosecutor's statements. He also questions the additional time the prosecutor spent in the fourth trial establishing Anna's background, believing Anna was presented as if she were an expert witness. Finally, he argues Anna's training actually supported the defense theory that she initially described someone else, but the prosecutor unfairly transformed this weakness for the People into a major asset. Coupled with the modified jury instruction, the jury was urged to find that the training enhanced Anna's ability to ultimately identify appellant. We disagree.

Appellant's failure to object to either this instruction in the trial court, or the prosecutor's argument, forfeits this claim on appeal. (*People v. Virgil, supra*, 51 Cal.4th at p. 1260.) The record reveals a very plausible tactical reason why defense counsel did not object to either the modified jury instruction or the prosecutor's arguments. Defense counsel argued in summation that Anna's initial descriptions of the shooter were accurate, and she described someone other than appellant. Defense counsel noted the inconsistency in the prosecution's case in that Anna's training supposedly made her better at identification but the prosecutor told the jury to disregard her original descriptions to law enforcement. The tactics of this defense approach at trial is evident and negates an ineffective assistance claim.

23

(*People v. Nguyen, supra*, 61 Cal.4th at pp. 1051–1052.)

Moreover, this claim fails on the merits. Prosecutors have a "solemn obligation to present evidence only if it advances rather than impedes the search for truth and justice." (*People v. Seaton* (2001) 26 Cal.4th 598, 649.) A prosecutor represents the sovereignty whose interest in a criminal case is obtaining justice and not winning a case, and a prosecutor cannot be the architect of a trial that does not match the standards of justice. (*Id.* at pp. 649–650.) However, a prosecutor is permitted to offer an opinion regarding the state of the evidence, and he or she has wide latitude to comment on a witness's credibility and quality. (*People v. Padilla* (1995) 11 Cal.4th 891, 945, overruled on another point in *People v. Hill, supra*, 17 Cal.4th 800, 823, fn. 1.)

An expert's opinion is treated differently than any foundational fact underlying it. (*Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 923.) The law does not give the same degree of credence or integrity to an expert's opinion as it does to the data underlying the opinion. (*Ibid.*) A jury may disregard an expert's opinion, even if uncontradicted, and draw its own inferences from the facts. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 83; *Kennemur v. State of California, supra*, 133 Cal.App.3d at p. 923; CALCRIM No. 332.) Moreover, if the facts underlying the expert's opinion are proved to be false or nonexistent, the expert's opinion is destroyed and that falsity permeates his or her entire testimony, calling into question the truthfulness of the expert's testimony. (*Kennemur v. State of California, supra*, 133 Cal.App.3d at pp. 923–924.)

Here, the prosecutor argued witness identification was a matter of common sense. The prosecutor was within his right to offer his opinion on the state of the evidence, to question Fraser's opinion testimony, and to ask the jury to reject Fraser's opinions. This record does not establish that the prosecutor suggested Fraser had endorsed Anna's training. Further, we disagree with appellant that the prosecutor's remarks were ambiguous requiring an analysis into whether there was a reasonable likelihood the jury misconstrued or misapplied his words.

Via a supplemental letter dated December 2, 2015, and during oral argument before this court, appellant cited three recent opinions supporting his arguments: (1) *United States v. Vera* (9th Cir.2014) 770 F.3d 1232 (*Vera*); (2) *United States v. Torralba–Mendia* (9th Cir.2015) 784 F.3d 652 (*Torralba–Mendia*); and (3) *United States v. Haines* (5th Cir.2015) 803 F.3d 713 (*Haines*). These authorities do not dictate reversal.

In *Vera, supra*, 770 F.3d 1232, the Ninth Circuit Court of Appeals found error when the trial court failed to instruct the jury on how to appropriately evaluate a law enforcement officer's dual testimony as both an expert and lay witness. (*Id.* at p. 1243.) *Vera* noted that dual capacity testimony was problematic because the agent's status as an expert could give him unmerited credibility when testifying as a percipient witness, cross-examination could be inhibited, jurors could be confused, and the agent might be more likely to rely on hearsay and stray from reliable methodology. (*Id.* at p. 1242.) *Vera* vacated the jury's drug quantity findings because the jury was not instructed on how to evaluate the officer's opinions, which were also given without adequate foundation. (*Id.* at pp. 1243–1244.)

In *Torralba–Mendia, supra*, 784 F.3d 652, the Ninth Circuit Court of Appeals found error when the trial court failed to instruct the jury regarding a federal agent's testimony as both an expert and percipient witness. (*Id.* at p. 661.) The

error, however, was not prejudicial because the agent's testimony was bifurcated between his expert testimony and percipient observations, he provided an adequate foundation for most of his observations, and a substantial amount of evidence, aside from the agent's testimony, connected the defendant to the crime. (*Id*. at pp. 661–662.)

Lastly, in *Haines, supra*, 803 F.3d 713, the Fifth Circuit Court of Appeals determined that the trial court properly qualified a drug investigator as an expert. (*Id*. at p. 727.) *Haines*, however, found error because the drug investigator's testimony was frequently blurred between his knowledge of drug crimes in general and his percipient knowledge of the conspiracy in this case. The government and the court did not adequately clarify for the jury that the witness gave percipient testimony regarding the meaning of certain words and phrases used in this conspiracy, but which were not used in the broader drug trade. The jury would not have known whether this was expert or lay testimony. However, the error was deemed harmless because other adequate evidence established that the defendants participated in the conspiracy. (*Id*. at pp. 733–734.)

Here, unlike the law enforcement agents in *Vera*, *Torralba–Mendia*, and *Haines*, Anna was never qualified as an expert witness and the jury was never instructed to treat her as one. Unlike the juries in *Vera*, *Torralba–Mendia*, and *Haines*, the jury here was not presented with conflicting testimony that blurred the distinction between expert knowledge and percipient observations. To the contrary, Anna testified as a percipient witness and her identification of appellant stemmed from her direct interactions with him. *Vera*, *Torralba–Mendia*, and *Haines* are factually distinguishable and do not dictate reversal. The jury was instructed to consider all of the factors underlying Anna's identification to determine whether her identification was credible or not. The prosecutor did not materially mislead the jury or commit misconduct regarding how it presented or argued Anna's training.

Alvarez, 2016 WL 192164, at *21-24.

Like previous claims, Petitioner failed to object at trial and therefore, this claim is procedurally defaulted. Petitioner also complains that counsel rendered ineffective assistance by failing to object, however, the state court reasonably determined that counsel had a tactical reason not to object. The appellate court found that counsel could have decided not to object and chosen instead to argue that Anna's earlier identification was accurate, when she had identified someone other than Petitioner. The state court's finding was not unreasonable.

In addition, the court pointed out that Anna was not qualified as an expert witness and the jury was never instructed to treat her as one. Rather, the jury was presented with all of the circumstances surrounding her identification. Ultimately, it was the jury's duty to determine whether her identification was credible. The claim is without merit and should be denied.

iv.     Diana's Testimony

Petitioner claims that Diana's testimony was unduly prejudicial and irrelevant since she

did not identify Petitioner and could only testify to the intruder shooting at her. Petitioner alleges the prosecutor misused her testimony by referring to the callousness of the shooter. This claim was rejected by the state court as follows:

> Diana was originally a named victim in the charges against appellant, but she did not testify in the first trial. Based on insufficient evidence, the trial court dismissed the two counts regarding Diana. Diana did not testify in the second trial, but she testified in both the third and fourth trials, stating that the assailant shot at her multiple times. Diana was unable to identify the shooter because she did not see his face.

> During closing arguments in the fourth trial, the prosecutor referred to the "ruthlessness" and "callousness" of appellant's actions. The prosecutor noted that appellant did not look like a killer, but argued this type of crime required someone who could look presentable at the door in an effort to gain entry. The prosecutor said appellant made a choice to shoot Anna and appellant fired at point-blank range at Diana when he heard her calling out. The prosecutor argued all of the evidence pointed to appellant. The prosecutor asked the jury to put their emotions aside, and render a verdict based on the evidence and law.

> Appellant asserts that the only issue in the fourth trial was the shooter's identity. He contends that the prosecutor over-proved his case with cumulative evidence that risked undue prejudice because Diana was unable to identify the shooter and the prosecutor had no need for her testimony. He questions why the prosecutor would argue about appellant's "ruthlessness" and "callousness" in attacking Diana, along with Anna and Volodia. He argues that even if Diana's testimony was properly admitted, the prosecutor used it improperly to inflame the jurors' passions. He maintains that the jury would have presumably been aware no one "would pay" for the attempted murder of Diana. We disagree.

> Appellant's failure to object to the prosecutor's argument forfeits this claim on appeal. (*People v. Virgil, supra*, 51 Cal.4th at p. 1260; *People v. Hill, supra*, 3 Cal.4th at p. 1000; *People v. Burgener, supra*, 29 Cal.4th at p. 869.) This claim also fails on the merits.

> A prosecutor is not required to discuss a case in a detached or clinical way. (*People v. Tully* (2012) 54 Cal.4th 952, 1021.) It is also not necessarily misconduct for a prosecutor to use derogatory epithets to describe a defendant. (*People v. Friend* (2009) 47 Cal.4th 1, 32 [defendant described as "'living like a mole or the rat that he is'"].) A prosecutor may make vigorous arguments, including epithets warranted by the evidence, so long as the arguments are not inflammatory and principally designed to arouse the jury's passion or prejudice. (*People v. Tully, supra*, 54 Cal.4th at p. 1021.)

> Our Supreme Court has repeatedly rejected claims of prosecutorial misconduct involving the use of epithets during closing arguments. (*People v. Tully, supra*, 54 Cal.4th at p. 1021; see, e.g., *People v. Young* (2005) 34 Cal.4th 1149, 1195 [no misconduct where prosecutor characterized crimes as "'serial killing,'" and "'terrorizing and killing'" people (italics omitted) ]; *People v. Jones* (1998) 17 Cal.4th 279, 308–309 [no ineffective assistance of counsel for failure to object to prosecutor's characterization of defendant's crime as a "terrorist attack" and comparison of defendant to "[t]errorists"]; *People v. Medina* (1995) 11 Cal.4th 694, 777–778 [no misconduct where prosecutor indicated during closing

arguments that it was impossible to recreate "'the terror, the violence'" during the defendant's crime spree]; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250–1251 [no misconduct where prosecutor referred to the defendant as a "'perverted maniac'"].)

Here, the prosecutor's comments were part of a discussion that appellant was capable of being the shooter despite not looking like a killer. Diana's testimony was proper because it linked the chronology of events. The words "ruthlessness" and "callousness" do not exceed the bounds of proper argument as they were part of vigorous summation warranted by the evidence. This record does not demonstrate that the prosecutor's comments were intended to inflame or were designed principally to arouse the jury's passion or prejudice. To the contrary, the prosecutor advised the jury to put their emotions aside, and render a verdict based on the evidence and law. The prosecutor's comments were fleeting characterizations in the course of lengthy summations, and they do not establish misconduct. (*People v. Tully, supra*, 54 Cal.4th at p. 1021.)

Finally, because appellant's claim has no merit, he cannot establish ineffective assistance of counsel. An attorney is not deemed incompetent when he or she fails to lodge meritless objections. (*People v. Lucero, supra*, 23 Cal.4th at p. 732.)

Alvarez, 2016 WL 192164, at *25-26.

Like previous claims, Petitioner did not object to Diana's testimony at trial and therefore forfeited the claim on appeal. Because of this, the claim is procedurally defaulted and must be dismissed. In addition, the claim is meritless. Therefore, defense counsel's failure to object was not unreasonable.

Diana's testimony was relevant evidence. She was a percipient witness, and her testimony provided additional chronology of the events. In addition, the state court reasonably found that the prosecutor's remarks were not misconduct. It was not improper for the prosecutor to argue that Petitioner was capable of being a shooter even though he did not present as a killer. Furthermore, his comments were not directed at inflaming the passions of the jury; to the contrary, he told the jury not to render a verdict based on their emotions, but on the evidence presented.

In any case, Petitioner cannot show that the admission of Diana's testimony was contrary to or an unreasonable application of Supreme Court precedent. There is no Supreme Court precedent governing a court's discretionary decision to admit evidence as a violation of due process. In Holley v. Yarborough, the Ninth Circuit stated:

Under AEDPA, even clearly erroneous admissions of evidence that render a trial

fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by "clearly established Federal law," as laid out by the Supreme Court. 28 U.S.C. § 2254(d). In cases where the Supreme Court has not adequately addressed a claim, this court cannot use its own precedent to find a state court ruling unreasonable. Musladin, 549 U.S. at 77, 127 S.Ct. 649.

The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see Williams, 529 U.S. at 375, 120 S.Ct. 1495, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application." Musladin, 549 U.S. at 77, 127 S.Ct. 649. Under the strict standards of AEDPA, we are therefore without power to issue the writ . . . .

Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); see Moses v. Payne, 555 F.3d 742, 760 (9th Cir. 2008) (holding that trial court did not abuse its discretion in excluding expert testimony "[b]ecause the Supreme Court's precedents do not establish a principle for evaluating discretionary decisions to exclude the kind of evidence at issue here").  Since there is no clearly established Supreme Court precedent governing a trial court's discretionary decision to admit evidence as a violation of due process, habeas relief is foreclosed.   Id.

                    v.        Photographic Lineup

        Petitioner claims that the photographic lineup was improperly constructed based on Petitioner's appearance, and the prosecutor misled the jury in discussing the manner in which the photographic lineup was constructed.  This claim was raised and rejected in the state court as follows:

Appellant raises concerns regarding how the photographic lineup was constructed, arguing it was prepared solely around his appearance and not based on the victims' descriptions of the suspect. He asserts the prosecutor misled the fourth jury regarding how law enforcement prepared the photographic lineup through which Anna identified him as her assailant.

During the fourth trial, the prosecutor asked the detective how he prepared the photographic lineup. The following exchange occurred:

"[Prosecutor]: Okay. Did you have a certain thought process in your placement of [appellant] in position five?

"[Detective]: You know, we kind of ran this around with the guys in the office and nobody had a real set way to do it. Some guys said don't ever put him in four, some guys said don't ever put him in one. I just—I just put him in five.

28

"[Prosecutor]: So did you actually—before showing anyone this lineup, did you talk to the other detectives?

"[Detective]: Yes.

"[Prosecutor]: Okay. So did any of them raise issues with you about your choice of people in these photographs?

"[Detective]: No.

"[Prosecutor]: I mean, I'm sorry, the people you chose to use in the lineup?

"[Detective]: No.

"[Prosecutor]: Okay. What about the subject of photocopying the color photographs?

"[Detective]: It was most likely one of their suggestions to do that."

On cross-examination, the detective said others in his department did not have a problem with the position of appellant's photograph. He received different theories regarding whether or not a suspect's photo should be placed in the middle because people naturally focus there. He was told, however, to do the lineup how he wanted. The detective thought appellant's original color photo stood out too much.

During closing arguments in the fourth trial, the prosecutor noted that the detective prepared a lineup using people with similar characteristics as appellant. At that point, "[the detective] talked to the other detectives, everybody kind of—this is not something where he's just cowboying it on his own, they talked about it, they say, no, you know what, this is—there is a problem here, too suggestive, it's going to immediately draw her attention to [appellant's photograph]...."

Appellant asserts that the prosecutor's message went against the facts from the previous trial and the prosecutor wanted to establish that the detective received some "professional input" regarding the lineup. He contends the evidence showed the detective was the sole decider and actor in creating the lineup, although he may have received some "unclear input" from others. Appellant argues the prosecutor's approach was in error because it (1) improperly mischaracterized the evidence; (2) relied on what unidentified non-witnesses purportedly said and did; (3) was materially misleading; and (4) the prosecutor took unfair and manipulative advantage through four trials against appellant.

As an initial matter, appellant has forfeited this claim on appeal following a failure to object in the lower court. (*People v. Virgil, supra*, 51 Cal.4th at p. 1260; *People v. Burgener, supra*, 29 Cal.4th at p. 869; *People v. Hill, supra*, 3 Cal.4th at p. 1000.) This claim also fails on the merits.

The record does not support appellant's arguments. In the first three trials, the prosecutor did not ask the detective if he received input from others. On cross-examination, however, the detective indicated others in his office gave him suggestions where a suspect's photo should be positioned in a lineup. Further, the detective testified in the fourth trial that someone likely suggested making a photocopy of the original color photographs. The prosecutor did not misstate or mischaracterize the evidence, and his comments were neither misleading nor

manipulative.

> Finally, because appellant's claim has no merit, he cannot establish ineffective assistance of counsel. An attorney is not deemed incompetent when he or she fails to lodge meritless objections. (*People v. Lucero, supra*, 23 Cal.4th at p. 732.)

Alvarez, 2016 WL 192164, at *26-28.

This claim is procedurally defaulted because Petitioner failed to object at trial. The claim is also meritless. As discussed by the appellate court, the prosecutor did not misstate the evidence. The detective was not asked in the first three trials whether he received input on the creation of the photo lineup. However, he indicated on cross-examination that others had made suggestions on placement of the photos. The prosecutor's comments did not misrepresent the evidence. Therefore, the claim has no merit and defense counsel was not ineffective in failing to object.

### vi.    Jessica Franks' Testimony

Petitioner next argues that the prosecutor committed misconduct by failing to seek further clarification when Jessica Franks, for the first time, testified at the fourth trial that she recalled seeing a scar on Petitioner's face. Petitioner states the prosecutor should have agreed to a clean and truthful stipulation or he should have arranged to recall Franks. This claim was raised on direct appeal and rejected by the state court as follows:

> Jessica Franks testified in the last three trials as a rebuttal witness. During the second and third trials, Franks was not asked to describe if appellant had anything distinctive about his face. However, the prosecutor posed such a question to Franks during the fourth trial, and she said she thought appellant had a facial scar. She admitted, however, that she could not see a facial scar on appellant in court as she testified.

> At the end of that day's session, the parties announced a proposed stipulation that Franks had never previously testified about a scar on appellant's face. The court instructed the parties to be ready with the stipulation in the morning. However, the parties never reached a stipulation and Franks was never recalled to testify. After both parties rested and outside the presence of the jury, appellant personally lodged an objection with the court that the prosecutor failed to recall Franks and no stipulation was ever reached. The court noted it could not force a stipulation between the parties.

> During closing arguments, the prosecutor did not reference Franks's memory of a scar on appellant's face. Defense counsel asked the jury to consider why Franks would mention a facial scar if it did not exist, noting the jurors could see for themselves that appellant had no facial scarring.

Appellant contends the prosecutor was responsible for introducing this "odd and unreliable piece of evidence" and then neither agreeing to a stipulation nor recalling Franks to the witness stand. Appellant speculates that the jury might have given weight to Franks's testimony and believed it was the same acne-scarred face that Anna initially reported to law enforcement. This argument is unpersuasive.

Appellant has forfeited this claim on appeal following a failure to object in the lower court. (*People v. Virgil, supra*, 51 Cal.4th at p. 1260; *People v. Burgener, supra*, 29 Cal.4th at p. 869; *People v. Hill, supra*, 3 Cal.4th at p. 1000.) Moreover, this claim has no merit.

The prosecutor did not mention this statement during closing argument and did not use this evidence in an effort to convict appellant. This record does not establish deceptive or reprehensible methods used by the prosecutor to convict appellant. (*Maciel, supra*, 57 Cal.4th at p. 541; *Samayoa, supra*, 15 Cal.4th at p. 841.) Prosecutorial misconduct is not present and a due process violation did not occur.

Finally, because appellant's claim has no merit, he cannot establish ineffective assistance of counsel. An attorney is not deemed incompetent when he or she fails to lodge meritless objections. (*People v. Lucero, supra*, 23 Cal.4th at p. 732.)

Alvarez, 2016 WL 192164, at *28.

Like the previous claims, this claim is procedurally defaulted for Petitioner's failure to object at trial. In any case, it is clearly without merit. The prosecutor never referred to or made use of Franks' scar testimony in his arguments; thus, there can be no misconduct. In addition, defense counsel cannot be faulted for failing to object, since there were no actions by the prosecutor upon which to base an objection. The claim should be denied.

              vii.     Statements Regarding Canchola's Honda

Petitioner next alleges that the prosecutor deprived him of a fair trial by referring to Canchola's Honda during opening statements and promising the jury that certain evidence would be introduced; however, no such evidence materialized. Therefore, the jury was misled into believing Petitioner was connected to the vehicle discovered near the incident.

Petitioner presented this claim to the state courts on direct appeal. The Fifth DCA rejected it as follows:

During opening statements in the fourth trial, the prosecutor told the jury that appellant had shown interest in purchasing Canchola's Honda and appellant had looked at the Honda. During closing arguments, however, the prosecutor admitted there was no such evidence. Appellant asserts the prosecutor committed misconduct in providing this opening statement. He concedes his defense counsel failed to object or request an admonishment, but asserts his counsel was constitutionally ineffective for not doing so. He contends the jury would have

31

reasonably understood the prosecutor knew from some other source that appellant had taken steps to buy the Honda from Canchola. He argues this part of the prosecutor's opening statement filled a major hole in the prosecution's case and a juror cannot be expected to pretend it made no difference.

As an initial matter, appellant has forfeited this claim on appeal following a failure to object in the lower court. (*People v. Virgil, supra*, 51 Cal.4th at p. 1260; *People v. Burgener, supra*, 29 Cal.4th at p. 869; *People v. Hill, supra*, 3 Cal.4th at p. 1000.) Moreover, this claim fails on its merits.

We disagree that this opening remark established reversible error. Even when we presume, without so deciding, that this statement amounted to misconduct, it was not prejudicial. Prosecutorial misconduct during an opening statement is not grounds for reversal unless the defendant was denied a fair trial because of the prosecutor's egregious or prejudicial conduct. (*People v. Harris* (1989) 47 Cal.3d 1047, 1080.)

Here, before opening statements were given, the trial court admonished the jurors that the attorneys' comments were not evidence. Approximately 13 days after making these opening comments, the prosecutor informed the jury during closing arguments that no evidence established appellant had seen Canchola's Honda and was interested in it. Given the passage of time and the judge's admonishment, it is not reasonable to believe the jurors would have continued to give weight or credence to these opening comments.

Further, sufficient evidence was introduced during the fourth trial to connect appellant to Canchola's Honda. The Honda was stored on a lot near appellant's residence in Riverside, and appellant had visited that lot. The Honda was later located in Fresno in the vicinity of the shooting. Even assuming misconduct occurred, it was not of a nature that requires reversal to protect appellant's rights to a fair trial. (*People v. Harris, supra*, 47 Cal.3d at p. 1080.) Finally, because appellant's claim has no merit, he cannot establish ineffective assistance of counsel. An attorney is not deemed incompetent when he or she fails to lodge meritless objections. (*People v. Lucero, supra*, 23 Cal.4th at p. 732.)

<u>Alvarez</u>, 2016 WL 192164, at *28–29.

As in previous claims, defense counsel failed to object to the prosecutor's alleged misconduct and forfeited the claim. It is therefore procedurally defaulted.

Regardless, the state court reasonably determined that Petitioner suffered no prejudice from the prosecutor's alleged misconduct. In his closing argument, the prosecutor conceded that there was no evidence showing Petitioner had seen Canchola's Honda or that he was interested in it. Moreover, there was ample other evidence connecting Petitioner to the Honda. It was established that the Honda was stored on a lot near Petitioner's residence; Petitioner had previously visited that lot; and the Honda was thereafter located near the shooting. Since the state court determination that Petitioner did not suffer any prejudice was not unreasonable, habeas

32

1  relief is foreclosed.

2              viii.   <u>Hired to Kill</u>

3       Petitioner complains that the prosecutor committed misconduct by arguing he was hired to

4  kill Volodia when there was no evidence on which to base such motive.  This claim was raised

5  and rejected on direct review, as follows:

6       Appellant contends the prosecutor improperly argued to the fourth jury that
         appellant was hired to kill Volodia. He asserts no evidence established his motive
7        to kill, the prosecutor's argument was speculative, and he maintains jurors would
         have believed the prosecutor had information that appellant was hired to kill
8        Volodia. He concedes his defense counsel did not object to the prosecutor's
         argument, but alleges his counsel was constitutionally ineffective for not doing so.
9        This contention is without merit.

10       Appellant has forfeited this claim on appeal following a failure to object in the
         lower court. (*People v. Virgil, supra*, 51 Cal.4th at p. 1260; *People v. Burgener,
11       supra*, 29 Cal.4th at p. 869; *People v. Hill, supra*, 3 Cal.4th at p. 1000.) Moreover,
         this claim fails on its merits.
12
         Sufficient evidence was presented in the fourth trial to support the prosecutor's
13       argument that appellant was hired to kill Volodia. Anna identified appellant as the
         male who knocked on her door and asked for Volodia by name. Volodia was on
14       house arrest and facing pending federal criminal charges. The male held envelopes
         and said he was from "the agency" with a delivery for Volodia. Anna believed it
15       was connected to the federal case. She offered to deliver the envelopes but the
         male insisted on a personal delivery. When Anna objected and took the envelopes,
16       the male produced a gun, shot her and proceeded into the house. Appellant's prints
         were left on one envelope.
17
         Further, approximately three or four weeks prior to this shooting, two African–
18       American men knocked at Anna's house. Her husband, Gary, answered the door
         and the men asked for Volodia by name. They said they had a delivery from the
19       agency and one of them held an envelope. Gary was home alone and the men left
         when Gary said Volodia was not there. The men left in a vehicle similar to an
20       older 1985 Toyota Camry that was dark in color.

21       Based on these facts, a reasonable inference exists that appellant was sent to kill
         Volodia. The prosecutor was permitted to infer a motive from the evidence and it
22       is the jury's domain to determine if that inference was logical or not. (*People v.
         Washington* (1969) 71 Cal.2d 1061, 1085.) Further, because the prosecutor was
23       within his right to make such an argument, the failure of appellant's counsel to
         make a futile or unmeritorious motion or objection does not establish ineffective
24       assistance. (*People v. Lucero, supra*, 23 Cal.4th at p. 732.)

25  <u>Alvarez</u>, 2016 WL 192164, at *29-30.

26       This claim is also procedurally defaulted under California's contemporaneous objection

27  rule.  In any case, it is clearly meritless.  The state court noted that there was evidence showing

28  Petitioner had been sent to kill Volodia.  When Anna answered the door, Petitioner asked for

                                        33

Volodia by name.  He was holding packages and stated he was from "the agency."  When she

offered to take the packages, he refused and insisted on personal delivery.  When Anna objected,

he pulled out a gun with attached silencer and immediately shot her.  As she fled, he continued to

shoot at her.  He then proceeded into the house and came upon Diana who he then tried to shoot.

She fled into a bedroom to hide with her mother, and Petitioner attempted to gain entry.

A similar incident occurred two weeks prior where two individuals came to the door with

packages asking for Volodia and stating they were from "the agency."  When they were informed

Volodia was not home, they left.  Based on this evidence, the state court reasonably determined

that there was ample evidence from which a rational factfinder could find Petitioner was sent to

kill Volodia.  The state court rejection was not unreasonable and the claim should be rejected.

### ix. Cumulative Error

In his final claim, Petitioner alleges the cumulative effect of the afore-mentioned alleged

errors deprived him of a fair trial in violation of his due process rights.  The state courts rejected

the claim as follows:

> Appellant suggests he suffered a due process violation from cumulative errors. This contention is without merit because we have rejected all of his claims. Accordingly, reversal is not warranted. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [the defendant's cumulative prejudice argument rejected based on findings each individual contention lacked merit or did not result in prejudice].)

Alvarez, 2016 WL 192164, at *30.

"Multiple errors, even if harmless individually, may entitle a petitioner to habeas relief if

their cumulative effect prejudiced the defendant."  Ceja v. Stewart, 97 F. 3d 1246, 1254 (9th Cir.

1996) (citing Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992)); see also Karis v. Calderon,

283 F.3d 1117, 1132 (9th Cir. 2002).  However, the Ninth Circuit has also recognized that where

there is no single constitutional error, nothing can accumulate to the level of a constitutional

violation.  See Rup v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996).  In this case, no errors occurred,

and hence, there can be no cumulative error.  Even if errors occurred, a reasonable factfinder

could have found that the cumulative effect of the alleged errors did not prejudice Petitioner.

## IV. RECOMMENDATION

Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be

34

DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten court days after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: __**January 11, 2018**__                    _____**/s/ Jennifer L. Thurston**
                                                        UNITED STATES MAGISTRATE JUDGE